UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NARISA SILVER,

              Plaintiff,

    – against –

LEE ANAV CHUNG WHITE KIM RUGER & RICHTER LLP,
LACWKRR NY LLC,
LACWKRR NY II LLC,
LACWKRR LLP,
NAEPHIL KWUN, and
MICHAEL M. YI,

              Defendants.

Case No.
_____LLA_____

COMPLAINT

Plaintiff Narisa Silver, by her attorneys Goddard Law PLLC, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.    This is a civil action brought on behalf of Plaintiff Narisa Silver against the law firm that employed her as an associate attorney, the various legal entities that the law firm uses as operating companies or otherwise, and two individual partners of the law firm. These defendants discriminated against Plaintiff in the terms and conditions of her employment on account of her race, ethnicity, gender, disability, perceived disability, and perceived status as a victim of domestic violence, including paying her a wage unequal to her Korean, Korean-American, and white coworkers doing equal work, creating a hostile work environment and constructively terminating her employment, and retaliated against her for complaining about that discrimination, including retaliation after her employment was terminated and after she notified Defendants that she intended to pursue legal claims against them, in violation of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL") the New York City Human Rights Law, N.Y. Admin Code §§ 8-101 *et seq.* ("NYCHRL"), and the New York Equal Pay Act, N.Y. Labor Law §§ 194,

1

198.  In addition, Plaintiff brings claims under New York law for intentional infliction of emotional distress and fraudulent inducement, and any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2.      The Court has diversity jurisdiction over Plaintiff's New York statutory and common law claims because complete diversity exists – Plaintiff is a resident of New Jersey and no Defendant is a resident of New Jersey, including none of the partners of the Defendant law firm or the members of the Defendant operating companies – and the amount in controversy, including but not limited to Plaintiff's unequal pay and liquidated damages during her employment, her lost wages following her employment, and her emotional distress damages exceeds $75,000.

3.      Venue is proper within this District pursuant to Lee Chun)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

4.      Defendants authorized their attorney to enter into a tolling agreement with Plaintiff concerning the statute of limitations with respect to her claim of intentional infliction of emotional distress, so that all claims pleaded herein are timely brought.

5.      On or about November 17, 2021, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  When the EEOC completes its investigation of her claims and issues her a right to sue, Plaintiff may seek to add her federal claims in this action.  If she chooses to do so and the Defendants or the Court grant her permission to do so, the Court will then additionally have federal subject-matter jurisdiction over Plaintiff's Title VII and Americans with Disabilities Act claims and supplemental jurisdiction over her New York State, City, and common law claims because they form part of the same case and controversy with Plaintiff's federal claims.

## THE PARTIES

6.      Plaintiff Narisa Silver (hereinafter "Plaintiff") is a mixed-race female citizen of the United States, of Chinese-American and Caucasian descent, a person with a disability, and was perceived by Defendants to be a victim of domestic violence.  Plaintiff currently lives in Princeton, New Jersey.  She resided in New York, New York during the course of the employment that is the subject of this Complaint.  She was employed by the Defendants as an associate attorney.

7.      Defendant Lee Anav Chung White Kim Ruger & Richter LLP (the "law firm") is an international law firm with offices in Los Angeles, Mexico City, and New York City.  Its principal place of business is located at 99 Madison Avenue, 8th Floor, New York, New York, where Plaintiff was employed.  None of the partners of the law firm is a resident of New Jersey.  At all relevant times, the law firm employed more than 20 employees.

8.      Defendants LACWKRR NY LLC and LACWKRR NY II LLC are companies organized under the laws of New York with their headquarters located at 99 Madison Avenue, 8th Floor, New York, New York.  Upon information and belief, they are operating companies and/or alter egos of the law firm.

9.      Defendant LACWKRR LLP is a company organized under the laws of California with its headquarters located at 520 South Grand Avenue, Suite 1270, Los Angeles, California.  Upon information and belief, it is an operating company and/or an alter ego of the law firm.

10.     Defendant Naephil Kwun ("Defendant Partner Kwun") is an individual residing in Kings County, New York.  She is a partner of the law firm.  The law firm and the other corporate defendants are liable for Defendant Partner Kwun's illegal acts, and Defendant Partner Kwun is individually liable for her own acts.

11.     Defendant Michael M. Yi ("Defendant Managing Partner Yi") is an individual residing in Kings County, New York.  He is the managing partner of the law firm.  The law firm and the other corporate defendants are liable for Defendant Managing Partner Yi's illegal acts, and Defendant Managing Partner Yi is individually liable for his own acts.

12.     Hereinafter, these Defendants are referred to collectively as the "Defendants."

13.     Defendants were, at all times relevant herein, Plaintiff's "employer," within the meaning of all relevant laws, including, but not limited to, the NYSHRL and NYCHRL.

## FACTUAL BACKGROUND

### Plaintiff is Interviewed and Hired at the Law Firm

14.     In or about April 2018, about the time that Plaintiff completed her law degree, she interviewed with Defendant Managing Partner Yi and Judith E. White ("Partner White") for a position at Defendants' law firm.  In addition to being a partner of the law firm, Partner White is also Defendant Managing Partner Yi's spouse.

15.     Looking at Plaintiff's resume, Defendant Managing Partner Yi said he was "intrigued" by her involvement in the Asian Pacific American Law Student Association at her law school, and Plaintiff said that she joined in order to "build community" at law school. Plaintiff also told Defendant Managing Partner Yi and Partner White that she was "bi-racial," of Chinese and Caucasian-American descent, and that she felt it was important to have a bi-racial presence in this organization.

16.     Defendant Managing Partner Yi began telling Plaintiff how "elite" Defendants' law firm was, and said that they were "like big law" except that they "always win."  Defendant Managing Partner Yi also said that they "had a lot of women working [there]" and that this was a "great place for women." Defendant Managing Partner Yi did most of the talking in the interview.

17.     Shortly thereafter, Defendant Managing Partner Yi offered Plaintiff a job as a Law Clerk, and Plaintiff accepted. Plaintiff began her employment on or about May 18, 2018 in its Corporate and Litigation Practice Group.

18.     Plaintiff's hiring was done by verbal agreement – she did not receive a written job offer or employment contract.

19.     Plaintiff started as an hourly wage worker, earning approximately $25.00 per hour. She worked full time, and she also worked overtime – a ten to twelve hour day – about one day each week. Plaintiff did not receive overtime pay for the hours that she worked above eight hours per day.

20.     Plaintiff's direct supervisors were Defendant Managing Partner Yi, who was Asian, and Korean-American; Defendant Partner Kwun, who was also Asian, and Korean-American; and Dohee Kim, a Senior Associate ("Senior Associate Kim"), who was Asian, and Korean-American.

21.     Besides Defendant Managing Partner Yi and Defendant Partner Kwun, the Corporate and Litigation Practice Group consisted of another partner, Allen W. Wong ("Partner Wong"), who was Asian, and Chinese-American.

22.     Kate Romick, who was white, was an Associate Attorney ("Associate Romick"). She began work shortly after Plaintiff was hired.

23.     Plaintiff was surprised that when she asked for an employment manual or employee guide, she was told that Defendants did not have one.

24.     Plaintiff was, however, given a guide on how to "deal with" Defendant Managing Partner Yi.  This guide was written by Defendant Partner Kwun and another female partner Jane Chuang ("Partner Chuang"), and is a Word document entitled "Style Manual and Policies." On April 30, 2019, Defendant Partner Kwun circulated an email with the subject "Onboarding

Checklist" to all attorneys and support staff. One item on this checklist was to "Review style manual."  Among other things, the final page of the guide, entitled "Other Policies", instructed employees to remind Defendant Managing Partner Yi of dates, to approach him during certain hours and to see him face-to-face rather than on email.

25.    Defendant Managing Partner Yi told Plaintiff that he was the *de facto* Human Resources department for the entire firm.

26.    Defendants had no employee manual detailing any discrimination or harassment policy or to whom an employee should report should discrimination or harassment occur.

27.    In or about September 2018, Plaintiff became a full-time salaried employee, earning approximately $80,000 a year. Upon information and belief, Defendants gave Associate Romick, the White associate, a higher salary than Plaintiff of over $100,000 and, upon information and belief, this was because she was white, and not of Chinese descent.  Although Associate Romick had more legal experience than Plaintiff, Defendant Managing Partner Yi did not like her work. On at least one occasion, Defendant Managing Partner Yi tore up a draft prepared by Associate Romick and told Plaintiff that she would have to take over Associate Romick's work because Associate Romick's writing skills were weak.  Defendant Partner Kwun and Senior Associate Kim told Plaintiff she was not allowed to delegate any work to Associate Romick because Defendant Managing Partner Yi "doesn't like her writing."

**Defendants Foster a Hostile Work Environment for Women**

28.    Very soon after she started, Plaintiff was shocked to find that Defendant Managing Partner Yi fostered a hostile work environment for women.

29.    Female employees and attorneys were forced to say goodbye to Defendant Managing Partner Yi deferentially when leaving the office.

30.     Defendant Managing Partner Yi became furious at female employees at various times and said that they were "being disrespectful."

31.     Defendant Managing Partner Yi constantly commented on female employees' appearance, including commenting on their outfits and their hair, and pointing at their breasts and saying, "You have lint on your shirt," "Get that stain off," or "Something is on your blouse."  This made Plaintiff extremely uncomfortable.

32.     On one occasion, Defendant Managing Partner Yi forwarded an email from an outside attorney to Plaintiff and Defendant Partner Kwun.  The outside attorney included a photo of herself in her email signature block.  She was a young, white, blond female with long hair and makeup.  Defendant Managing Partner Yi's message to Plaintiff and Defendant Partner Kwun was "Hmm.  About that photo . . ."  Upon information and belief, Defendant Managing Partner Yi sexualized his working relationship with Plaintiff and Defendant Partner Kwun by focusing salaciously on the young outside attorney's physical appearance, and perhaps he wanted also to demonstrate to Plaintiff and Defendant Partner Kwun how they should dress and groom themselves.

33.     When discussing the hiring of female employees or associates, Defendant Managing Partner Yi obsessively and repeatedly asked whether the female employees believed that the potential female hire was "deferential" enough or would be "deferential" to him.

34.     Defendant Managing Partner Yi would not allow his all-female, in-office staff or attorneys to leave the office for lunch or breaks, instead insisting that food be delivered to their desks.

35.     Defendant Managing Partner Yi also responded in fury on the phone to female attorneys from other law firms, and to women in general, but would speak normally and calmly to

male attorneys and men in general. He called various women with whom he interacted from outside the office "stupid" or "idiots," and did not do so with men.

36.     Defendant Managing Partner Yi allowed Partner Wong, a man, to work fully remote from home long before the COVID-19 pandemic, but did not allow Defendant Partner Kwun, a woman, to do so.

37.     At the law firm's request, Plaintiff interviewed two applicants for a part-time paralegal position for an urgent, time-sensitive project in a specific niche field of real estate law. On August 1, 2020, Plaintiff and Defendant Partner Kwun recommended to Defendant Managing Partner Yi that he hire the Hispanic male applicant who had significant paralegal experience in this field.  Defendant Partner Kwun later forwarded to Plaintiff an email exchange between herself and Defendant Managing Partner Yi, in which Defendant Managing Partner Yi chose instead to hire Megan Gee ("Paralegal Gee") within a 5-minute email turnaround time, and without speaking to either applicant, and, according to Defendant Partner Kwun's WhatsApp message of the same day, Defendant Partner Kwun "doubt[ed]" that Defendant Managing Partner Yi read Plaintiff's reviews of the two applicants.  Paralegal Gee had no relevant experience whatsoever, but was chosen over the male applicant, upon information and belief because she was soft spoken and shy and by her name was recognizably an Asian American female.

38.     Each time Defendant Partner Kwun told Defendant Managing Partner Yi that she had to leave work because of child care duties or doctor's appointments for her children, Defendant Managing Partner Yi yelled and screamed after she was gone: "Where is [Defendant Partner Kwun]?"  "Why is she always gone?"  "Why are her kids always sick?"  "What is wrong with her?"  "She's never here!" and "I should fucking fire her!"

39.     When Plaintiff quietly questioned Defendant Managing Partner Yi's behavior to the other female employees and attorneys, their reactions clearly showed that they feared him. They told Plaintiff that they would lose their jobs if they did anything to challenge Defendant Managing Partner Yi.

40.     Many female employees stated, "That's just [Defendant Managing Partner Yi]," "We can't do anything about it," and "All we can do is change ourselves for him."

41.     Senior Associate Kim said that Plaintiff should be "grateful" that there were no men in the office, and that Defendant Managing Partner Yi "did not work well with them," since they "talk back" and "get in fights" with him, unlike female employees.

42.     On August 12, 2019 at 12:22am, via WhatsApp messenger, Plaintiff messaged Senior Associate Kim about Defendant Managing Partner Yi's disturbing behavior, and stated feebly that she just hoped the situation calms down soon. Senior Associate Kim replied directly at 12:23am, simply saying "Right fingers crossed". On this occasion, and many others, she did not urge Plaintiff to be assertive, but to rather to have "fingers crossed" and merely hope that things get better for her.

43.     Upon information and belief, Defendant Managing Partner Yi had a pattern and practice of hiring women, Asian women, and allegedly "deferential women" so that he could dominate, harass, and discriminate against them, believing that they would not "fight back" or oppose his discriminatory or harassing behavior towards them and other women.

44.     Plaintiff mentioned to Senior Associate Kim that one employee ("Employee Doe") told her that a former female Associate had been Defendant Managing Partner Yi's "punching bag" ("Associate Jane Doe"). In response, Senior Associate Kim first demanded to know the identity of Employee Doe, and then said that the former associate was "from Japan" and didn't

know "how to talk" to Defendant Managing Partner Yi. She stated that Defendants needed to find more attorneys like Olivia Lee, a Korean-American Partner in the law firm's Matrimonial Practice ("Partner Lee") because she "knows how to talk to [Defendant Managing Partner Yi] the right way, so he does not yell at her and people respect her."

45.     Defendant Managing Partner Yi's discriminatory and harassing behavior towards women continued throughout Plaintiff's employment.

### **Partner Yi Ridicules Plaintiff for Taking Necessary Medication**

46.     Because Defendant Managing Partner Yi would not let his female employees leave their desks for lunch or other breaks, Plaintiff was forced to order her necessary medication delivered to her at the office. Defendant Managing Partner Yi ridiculed Plaintiff for taking medications, stating: "Hey, what are those you got there?" or "That's a lot of drugs," and mockingly saying "Are those opiates?" and "Are those Opioids?" and laughing.

47.     The office was aware that Plaintiff took prescription medications. Plaintiff received regular pharmacy deliveries, which were left with either Office Manager Mustafich or Defendant Managing Partner Yi's sister, Young Ku, who worked at the front desk. Plaintiff also directly informed Defendant Partner Kwun and other employees that she took prescription medication through communications such as her email of August 27, 2019, in which she wrote "I went to the pharmacy to pick up my usual prescriptions this morning."

48.     Plaintiff was extremely embarrassed and tried to hide from Defendant Managing Partner Yi each time she got necessary medications delivered to the office.

### **Defendant Managing Partner Yi Terrifies Plaintiff with His Fury**

49.     Defendant Managing Partner Yi's fury very often extended to Plaintiff herself. Defendant Managing Partner Yi repeatedly walked furiously into Plaintiff's office, closed the

door, screamed at her, towered over her and waved his hands, turned bright red in the face, slammed his hands on the desk, ripped up papers in front of her, or threw papers at her or on the floor. He often blamed her for mistakes or issues that were not her fault. Defendant Managing Partner Yi's outbursts were explosive and unpredictable.

50.     Defendant Managing Partner Yi also changed his standards and his instructions from one hour or one day to next, and Plaintiff constantly suffered serious anxiety that she would do something he thought was "wrong" and would thereby incite his fury.

51.     Defendant Managing Partner Yi told Plaintiff, "You're lucky to have a job," and "I should fire you."

52.     Plaintiff consulted with her therapist and her psychiatrist, who prescribed anxiety medication because Plaintiff was so anxious and fearful because of Defendant Managing Partner Yi's behavior.

53.     Defendant Managing Partner Yi was particularly abusive and harassing to Connie Kuang, a paralegal who was Asian-American of Chinese descent ("Paralegal Kuang"), who repeatedly cried in the office because of Defendant Managing Partner Yi's behavior towards her. Similar to Plaintiff, she was subject to upsetting comments about her appearance and dress, also given an excessive amount of work in comparison to her peers (other paralegals), pressured to complete high-level assignments typically done by attorneys, and told to not complain and be grateful for everything Defendant Managing Partner Yi has done for her. She was extremely scared of "getting in trouble" with the partners, and would privately confide all this to Plaintiff over text message, email, and voice messages, asking Plaintiff to promise to not tell management of her complaints.

54.     Upon information and belief, Defendant Managing Partner Yi never treated the Korean-American employees or the white employees or the men in the office so abusively as he treated the Japanese, Chinese-American, and Hispanic women.

55.     Upon information and belief, Defendant Managing Partner Yi was specifically abusive and harassing to Plaintiff and Paralegal Kuang because they were women, but also because they were not Korean-American or white, and in particular because they were Asian-Americans of Chinese descent.  Upon information and belief, Defendant Managing Partner Yi demanded more work and more strict obedience from Plaintiff, Paralegal Kuang, and others in the law firm because they were not Korean-American and, in his eyes, less human.

**Plaintiff Reports Defendant Managing Partner Yi's Discriminatory Behavior
to the Senior Associate**

56.     Not knowing what to do about Defendant Managing Partner Yi's harassing and offensive behavior, Plaintiff told Senior Associate Kim, her supervisor, about Defendant Managing Partner Yi's furious explosions at her, and how he behaved when he closed her office door.

57.     Senior Associate Kim told Plaintiff that she had to "put up" with him, because employees who did not were "fired" by Defendant Managing Partner Yi.

58.     Shocked, Plaintiff asked if Partner Chuang was subject to Defendant Managing Partner Yi's offensive and discriminatory behavior. Senior Associate Kim said that was exactly what happened.

59.     Senior Associate Kim said that Plaintiff should just think of Defendant Managing Partner Yi as "a big baby" and an "irrational toddler," thereby clearly indicating that Plaintiff needed to "mother" him, as a woman. In response to Plaintiff's complaints, she messaged Plaintiff and said that Plaintiff simply had to accept that he sometimes "went ballistic" against her. She

advised Plaintiff to just placate Defendant Managing Partner Yi, and serve his whims as much as possible, essentially telling her to defer to him because he was a man.

### Plaintiff Reports Defendant Managing Partner Yi's Discriminatory Behavior to Partner Wong

60.     Defendant Managing Partner Yi continued his habits of screaming at Plaintiff and belittling her.  Her anxiety and fear increased.  She repeatedly attempted to be assertive with Defendant Managing Partner Yi, telling him that she could not handle the workload he requested of her, and that his instructions and feedback were inconsistent and did not make sense.  Defendant Managing Partner Yi consistently disregarded Plaintiff's feedback, and instead became more enraged each time she attempted to be assertive.

61.     In an email sent August 26, 2020 at 1:25 p.m., Plaintiff wrote Associate Romick, Senior Associate Kim, and Defendant Partner Kwun, saying that "we should have a team discussion" regarding Defendant Managing Partner Yi's extremely volatile behavior, and asking if "someone could speak to [Defendant Managing Partner Yi]" about his hostile and unpredictable behavior.  None of the three responded to her email, or ever addressed her concerns or requests for help.

62.     Finally, Plaintiff reported Defendant Managing Partner Yi's behavior to Partner Wong, the male partner who worked remotely.

63.     Partner Wong suggested that Plaintiff "push back" on Defendant Managing Partner Yi's aggression, but also said that she should placate him by thinking of solutions to the things he screamed and yelled at her about.

64. Partner Wong refused to ever intervene on Plaintiff's behalf and attempt to engage Defendant Managing Partner Yi or anyone else in the law firm in a discussion of Defendant Managing Partner Yi's behavior and treatment of employees.

**Senior Associate Kim Compares Plaintiff to a "Dog" Because of Her Heritage**

65. In or about October 2018, Plaintiff was eating her lunch at her desk, which happened to be Asian food. Senior Associate Kim saw her food and asked why Plaintiff "order[ed] Asian food so much."

66. Plaintiff told her that she was familiar with and liked Asian food because her mother was Chinese.

67. Senior Associate Kim, who was Korean-American, gasped, as if Plaintiff had insulted herself by proclaiming her Chinese heritage and said, "You know, my friend got a DNA test for her dog, to make sure that it was purebred." Upon information and belief, Senior Associate Kim was implying that that a Chinese heritage would be undesirable and offensive to the law firm, and Plaintiff should "check" whether she was "really" Chinese.

68. Plaintiff told her that she had already taken a DNA test to find out all of the strands of her heritage, and in fact the test matched her to her grandmother's familial province in China, and several Chinese cousins.

69. Senior Associate Kim looked disapproving, and said that the test "must" be wrong given Plaintiff's non-Chinese "facial features," and insisted that she take another DNA test. Following this incident, Senior Associate Kim's behavior towards Plaintiff worsened, and Plaintiff sensed that Senior Associate Kim thought less of her because of her Chinese ancestry, similarly to how Senior Associate Kim thought less of Associate Jane Doe and how she believed that Associate

Jane Doe served as Defendant Managing Partner Yi's "punching bag" because she was from Japan and didn't know "how to talk" to her superior.

### Defendant Managing Partner Yi Fires a Latina Employee for Objecting to Discrimination and Harassment

70.     In or about the Summer of 2019, Plaintiff learned that Jinnette Grullon, the Office Manager, a Hispanic woman ("Office Manager Grullon"), emailed all of the named partners to say that Defendant Managing Partner Yi's harassing and abusive behavior was unacceptable, and that she was raised to treat people with decency, kindness, and to not scream to get a point across.

71.     That week at a team meeting, Defendant Managing Partner Yi announced that he had fired Office Manager Grullon for "causing too much drama," and "being insubordinate."

72.     Later that same day, Senior Associate Kim stated to Plaintiff that Defendant Managing Partner Yi "tried hard" to keep Office Manager Grullon but he "had to" fire her because she was a "single mom," her "kids were always sick, and she couldn't show up," and she was "rude to him." Upon information and belief, Defendant Managing Partner Yi fired Office Manager Grullon because she was a woman, a Hispanic woman, and because she had child-caretaking responsibilities.

73.     This report made Plaintiff even more fearful of challenging Defendant Managing Partner Yi's behavior, or standing up for herself in any way against his discriminatory and harassing behavior.

### Defendant Managing Partner Yi Makes Homophobic Comment Concerning A Sexual Harassment Policy

74.     In or about July 2019, Plaintiff brought up in a team meeting that the firm was required to implement a sexual harassment training that was mandated by New York City.

75.     Defendant Managing Partner Yi shook his head and responded: "You know who make a lot of false sexual harassment allegations?  Lesbians."

76.     All the employees in the room remained silent, clearly embarrassed and uncomfortable at this homophobic remark from the law firm's managing partner.

77.     Plaintiff reminded Defendant Managing Partner Yi at follow-up meetings that the city required him to implement sexual harassment trainings, and she put it on Defendant Managing Partner Yi's weekly "to do" list, but Defendant Managing Partner Yi refused to implement the trainings.

### Plaintiff's Workload Triples

78.     In or about Summer 2019, Plaintiff became a *de facto* Senior Associate when Senior Associate Kim moved to South Korea to open an office for Defendants there.  Plaintiff was not given a promotion or a raise.  Instead, Defendant Managing Partner Yi called Plaintiff into his office and simply informed her that she was now going to be "the new Dohee."

79.     Plaintiff's workload immediately doubled or tripled, as she took on much of Senior Associate Kim's tasks, including the lead role on motion practice, and the chief responsibility for coordinating with Defendant Managing Partner Yi on his deadlines and serving as his "right hand."

80.     Associate Romick had far less work than Plaintiff, and, because she had more years of experience as a lawyer than Plaintiff, could have been considered for additional responsibilities after Senior Associate Kim's departure.  However, upon information and belief, Associate Romick, who was white, was paid more than Plaintiff despite the fact that she had a lower title, performed inferior work, and was given fewer responsibilities.

81.     Defendant Managing Partner Yi and Defendant Partner Kwun repeatedly re-routed Associate Romick's work to Plaintiff instead of other attorneys with years more experience

because of Plaintiff's superior performance and because they believed they could overburden Plaintiff with work because she was an outsider to them, a Chinese-American.

82.     On August 24, 2020, at 4:31 p.m., Defendant Partner Kwun wrote to Plaintiff over WhatsApp that she must review and revise Associate Romick's work when she assists Plaintiff with an assignment, stating "you should def [*sic*] review them all to make sure they're accurate and in good shape before [Defendant Managing Partner Yi] sees them."  Associate Romick referred to her own writing as "memo-to-trash" (upon information and belief, a play on the term "memo-to-file") due to the known problem of Defendant Managing Partner Yi ripping up and throwing out her writing.

83.     Senior Associate Kim told Plaintiff that she had to do Associate Romick's work because Associate Romick's work was "inferior."

84.     Meanwhile, Associate Romick was able to leave at 7:00 p.m., take uninterrupted vacations, weekends off, and multiple sick days, while Defendant Partner Kwun and Senior Associate Kim did not allow Plaintiff to take time off without interrupting it with frequent emails and demands.

85.     When Plaintiff asked whether Associate Romick had received an email, Senior Associate Kim said that "some people" did not need to answer their emails on weekends. Upon information and belief, Associate Romick was given weekends off, unlike Plaintiff, because she was a preferred color and race – white.

**Partner Wong Says That Plaintiff was a "De-Facto Partner" Given Her Workload**

86.     On August 28, 2019, Partner Wong called Plaintiff and asked "how she was doing." He told Plaintiff that Defendant Managing Partner Yi and Defendant Partner Kwun were giving Plaintiff inappropriately high-level work above her pay grade, and that she had been made a "de

facto assignment Partner" as a result. He said that it was unacceptable that Defendant Managing Partner Yi treated her so poorly.

87.    Plaintiff took live notes during this call, and emailed her transcription of the call directly to her work email later in the day after the call, on August 28, 2019 at 10:03pm. Her direct transcription of the call was two pages long. Partner Wong stated that the law firm "need[s] an overall comprehensive approach that everyone has a role in. Don't be a hero . . . If it's really the case that is important, and it'' being placed on a first-year associate, it's not going to be treated as a priority matter. [Plaintiff is looking] for support in the wrong way." He also told her to never state "because Allen told me" as a reason she is being assertive, but to rather say "I need support and you're the one to give it to me" when approaching Defendant Partner Kwun and Defendant Managing Partner Yi.

88.    Partner Wong also concluded that there seemed to be a "big disconnect between rhetoric and the resource commitment," and that the firm needs "rules of engagement" and "operational responsibility [is Defendant Partner Kwun]'s responsibility"  and if "[Plaintiff] is not equipped . . . send it back to [Defendant Partner Kwun.]"

89.    Partner Wong urged Plaintiff to "talk to" Defendant Managing Partner Yi about the fact that "he and Defendant Partner Kwun" "should be the ones doing this work."

90.    Plaintiff meekly thanked Partner Wong for his advice, but told him that she couldn't possibly do or say this or she would get screamed at, or even fired. Partner Wong repeatedly insisted, unhelpfully, that Plaintiff should "stand up for [her]self" when Defendant Managing Partner Yi was being abusive and harassing. However, even though he was a Partner at the firm, Partner Wong refused to do anything about the discrimination and harassment by Defendant Managing Partner Yi.

### Defendant Managing Partner Yi Questions Plaintiff's Appearance and Her Domestic Abuse

91.     In or about the Fall of 2019, Plaintiff was unfortunately forced to flee an abusive romantic relationship and find a new apartment, but she continued to work as hard as ever despite serious anxiety, depression, and mental health issues. She continued to see a therapist and a psychiatrist for her mental health disability.

92.     In or about October 2019, Defendant Managing Partner Yi walked into Plaintiff's office, closed the door and said Plaintiff "looked awful" and that her "clothing was wrinkled."

93.     Plaintiff reluctantly disclosed to Defendant Managing Partner Yi that she was commuting five hours round trip because she had fled an abusive relationship.

94.     Defendant Managing Partner Yi became angry, saying "Why didn't [Defendant Partner Kwun] know about this?" "Why didn't [Defendant Partner Kwun] catch this?" and "How could [Defendant Partner Kwun] not see this?"

95.     Defendant Managing Partner Yi then told Plaintiff that she was "close to losing [her] job," and that she was "lucky to have [him]" when she "showed up late" and "looked homeless."

96.     He instructed Plaintiff to share all of the details of her domestic violence with Defendant Partner Kwun, so that she could "explain" her "poor performance."

97.     He also told Plaintiff to share her experience with Partner White.  Partner White is Defendant Managing Partner Yi's wife.

98.     He also said that Plaintiff should "really go to therapy." Plaintiff told him that she was already in therapy, that she was being treated for mental health issues, and that her therapist had helped her leave the abusive relationship. In doing so, Plaintiff reported to Defendant

Managing Partner Yi that she was suffering from a mental health disability, and that she was a victim of domestic violence.

99.     When Plaintiff told Defendant Partner Kwun about the domestic violence, she cried and said, "How could I not have known?"  She told Plaintiff she should have told Defendant Managing Partner Yi about the abuse sooner, and that Defendant Managing Partner Yi "even pays for people's therapy."

100.     Plaintiff told her that she had already gone to therapy because of this, she was being treated for mental health issues, and that she had made a breakup and escape plan in coordination with that therapist.

101.     In this way, Plaintiff reported to Defendant Partner Kwun that she was suffering from a mental health disability, and that she was a victim of domestic violence.  In fact, after their conversation on October 3, 2019, Partner White referred her to a speak with a domestic violence police unit, and Plaintiff wrote Partner White, Defendant Managing Partner Yi, and Defendant Partner Kwun an email this same day stating that she would contact the domestic violence police unit as suggested.

102.     Defendant Partner Kwun repeatedly referenced Plaintiff's as a "domestic situation," and in a series of WhatsApp messages on July 23, 2020, she asked Plaintiff if she could share information about Plaintiff's "past domestic situation" with an individual whom Defendant Partner Kwun was concerned was potentially also in a situation of domestic abuse. In that same WhatsApp conversation, at 3:41pm, Defendant Partner Kwun stated to Plaintiff "you had a concerning situation that we should have intervened/reached out about sooner . . . I still feel so sick that you had to move out, etc., all on your own" and this statement was followed by a "smiley face."

103.    Defendant Partner Kwun then began telling Plaintiff that even though she was going through something difficult, it was important that she was "always working," and that she "must make [Defendant Managing Partner Yi] happy."

104.    She explained further that coming from a working-class "immigrant family" taught her to "maintain a strong work ethic" despite any hardship.

105.    Plaintiff told Defendant Partner Kwun she could relate to an immigrant family having a strong work ethic, as her grandmother had been sold as an 8-year-old child from Shenzhen, China to a family from Malaysia to be a child bride and servant for the family, who were members of a criminal syndicate.

106.    She stated that her grandmother had later been abandoned by the criminal syndicate family after she came of age, and worked tirelessly as an illiterate street vendor until her death.

107.    Surprised, Defendant Partner Kwun said that she "knew of" Shenzhen, China. In fact, she said, she had hosted a "book club" that featured a book about families and relationships in Shenzhen. Defendant Partner Kwun noted the book addressed the Chinese phenomenon of child brides like Plaintiff's grandmother.

108.    Defendant Partner Kwun stopped the conversation with Plaintiff, turned to her computer, and sent her information about a book entitled "The Ugly Wife is a Treasure at Home: True Stories of Love and Marriage in Communist China," insisting that Plaintiff "read up on" her Chinese "culture."

109.    Defendant Partner Kwun then reiterated how important it was to make Defendant Managing Partner Yi happy with her work before Plaintiff left her office.

110.    Always accommodating, Plaintiff ordered the book and started to read it. She saw that the book was filled with outdated and offensive stereotypes about her grandmother's city, and

Chinese people and Chinese women in general.  The book was written from the perspective of an Caucasian, American author who spent one year in Shenzhen, who openly admitted having no knowledge or experience regarding Chinese culture prior to the single year she spent in Shenzhen writing this book.

**Plaintiff Develops A Rare Medical Disease Because of Stress from Work**

111.    In or about Fall 2019, Plaintiff developed large, purple bruising on her arms and legs, and consulted with five different types of specialists to attempt to diagnose her illness. The specialists could not diagnose the illness, but said that this was likely due to the extreme stress, anxiety, and mental health issues that she reported to them.

112.    Upon information and belief, Plaintiff's illness developed as a response to the abusive and discriminatory treatment Plaintiff experienced working at Defendants' law firm.

113.    Plaintiff told Defendant Partner Kwun about the illness and showed her pictures of the large bruises on her body. Months afterwards, and without Plaintiff ever mentioning or sharing to Defendant Partner Kwun that the bruises were due to stress or any other mental health condition, Defendant Partner Kwun reflected that Plaintiff's bruises must have been from "leaving her crazy ex-boyfriend," because her own eczema (skin condition) flared up when she was stressed about "her relationship."

**Defendant Managing Partner Yi Orders Plaintiff To Study the Korean Ideal of "Nunchi"**

114.    In or about November 2019, Defendant Managing Partner Yi ordered Plaintiff into his office and screamed that she had made a "typo" in an email, which was allegedly leaving out one comma on a minor letter. Defendant Managing Partner Yi told Plaintiff that he "seriously doubted [her] judgment," and Plaintiff began to cry in his office.

115.    Defendant Managing Partner Yi told her to "stop all her work", kept her after-hours to talk about the Korean philosophy of Nunchi despite her stating that she had plans to meet her cousin that evening. He directed her to an article about Nunchi entitled "The Korean Secret to Happiness and Success."

116.    He told Plaintiff that "Nunchi" was synonymous with "judgment," and that this was something that she was severely lacking. He instructed her to read this particular article, which was just published the previous weekend in the New York Times, and told her to follow the article's instructions on how to utilize Nunchi.

117.    The article discussed how "women and minorities" could benefit by remaining quiet, observing, and "never passing up a good opportunity to shut up."

118.    He also told Plaintiff to speak to Olivia Lee, a Korean-American female partner in Defendants' matrimonial group ("Partner Lee").  Defendant Managing Partner Yi said that Partner Lee had "good Nunchi" and Plaintiff could "learn from her."

119.    Upon information and belief, neither the Korean-American, nor the White, employees were told by Defendant Managing Partner Yi that they had poor "judgment" and that they must study Korean concepts in order to complete their jobs, and Plaintiff was only told to do so because she was of Chinese descent; this was Defendant Managing Partner Yi's attempt to censure Plaintiff for not being quiet and submissive enough like the Korean women he preferred.

120.    When Plaintiff read the article, she was shocked at the offensive message that Defendant Managing Partner Yi was sending her about how she should act in the office.

121.    Fearful of failing to follow Defendant Managing Partner Yi's orders, Plaintiff asked to meet with Partner Lee, telling her that Defendant Managing Partner Yi told her that she did not

have good Nunchi, but that Partner Lee did have good Nunchi and that she should get "advice" from her.

122.    When she met with Partner Lee, the first thing Partner Lee asked was whether Plaintiff was Korean. Upon information and belief, Partner Lee asked if Plaintiff was Korean because she knew that Defendant Managing Partner Yi discriminated against non-Korean women.

123.    Plaintiff told Partner Lee that she was half Chinese and half Caucasian.

124.    When Plaintiff asked Partner Lee how she could have better Nunchi, Partner Lee told Plaintiff that the key to working at Defendants' law firm was knowing that Defendant Managing Partner Yi was "crazy," but that she would "learn a lot," and "be a better lawyer" because she worked for him.

125.    Thereafter, Defendant Managing Partner Yi repeatedly and continuously asked Plaintiff whether she had done research on Nunchi, and ordered her to study Nunchi again, and scolded Plaintiff for having "bad Nunchi" or "bad judgment."

126.    In one instance, Plaintiff proposed a strategic approach to a legal matter, and Defendant Managing Partner Yi shut down all substantive discussion.  Instead, he insisted that Plaintiff repeatedly pronounce a Korean last name "Choe" in front of him until she said it "correctly," with a *Korean* pronunciation. He then sent her home and ignored her strategic idea. Plaintiff was humiliated.

127.    But when Partner White proposed the same legal strategy a few days later, Defendant Managing Partner Yi engaged her in a serious discussion about the proposed approach in Plaintiff's presence. Plaintiff remarked, "That's exactly what I said to do, and he wouldn't listen to me!"  Defendant Managing Partner Yi and Partner White just ignored this remark, and ignored Plaintiff.

128.    Upon information and belief, Defendant Managing Partner Yi repeatedly told Plaintiff that she must act more like a Korean-American employee because he believed that non-Koreans, and in particular people of Chinese descent, were less valuable as employees than Korean-Americans.

**Defendant Managing Partner Yi Is Enraged at Plaintiff's Appearance and Dress and Insults "The Chinese"**

129.    In or about December 2019, Plaintiff arrived at a conference she was attending with Defendant Managing Partner Yi in a professional outfit of business slacks, a button-down shirt, and a blazer. Defendant Managing Partner Yi looked furious at Plaintiff at the conference, and she wondered what she could have done wrong to make him so angry at her.

130.    In the taxi on the return to work, Defendant Managing Partner Yi became enraged, telling her that her pants and blazer were not "professional" and asking repeatedly if she owned a *skirt* suit. Furious, he said repeatedly that she "had no professionalism" and that she was "ruining the firm's image." He told Plaintiff to go to "Hugo Boss" and buy a blue *skirt* suit (not a pants suit).

131.    Upon information and belief, Defendant Managing Partner Yi knew very well that Plaintiff had a *pants* suit, because she wore it for her interview with him and on other occasions, and ordered her to get a *skirt* suit because of stereotypical ideas about how women should dress.

132.    Defendant Managing Partner Yi then said, after seeing a Chinese restaurant on the street, that he preferred "Taiwan" or "Hong Kong" better than mainland China, because mainland China was "dirty," "disgusting," "not clean," and Chinese people were "rude," all the while knowing that Plaintiff was of Chinese descent.

133.    When they reached the office, Plaintiff went to speak with Defendant Partner Kwun. She told her that Defendant Managing Partner Yi had been extremely upset and angry at

her outfit, which she thought was professional, and had repeatedly ordered her to get a "Hugo Boss skirt suit." Plaintiff said that she already had a suit – a pants suit.

134.    Defendant Partner Kwun yet again did not address Defendant Managing Partner Yi's discriminatory and harassing behavior, only saying that she had to "trust" Defendant Managing Partner Yi, because he "knew what was best," and that she had to "listen to" him. She unhelpfully suggested that if she could not afford a Hugo Boss skirt suit, she should get a skirt suit at a less expensive store, like J. Crew.

135.    Defendant Partner Kwun reiterated that Plaintiff must "trust [Defendant Managing Partner Yi]."

**Defendant Managing Partner Yi Makes Discriminatory Comments about Korean Women and Bi-Ethnic Relationships**

136.    In or about December 2019, Defendants held a Christmas party.  During the party, Plaintiff was sitting near Defendant Managing Partner Yi and heard him repeatedly question Partner Wong about the fact that he was Chinese-American, and his wife was Korean-American. He asked Partner Wong, "How is it being married to a Korean woman" because "they're kind of crazy, you know?" He told him that this was why he married a white woman, Partner White. When Partner White joined the conversation, she also questioned Partner Wong about his wife, asking him if it had ever been "an issue" that his wife was Korean. Partner Wong laughed nervously and said: "There's more important things about a person" than whether they are Korean.

137.    In addition, at dinner, Defendant Managing Partner Yi repeatedly asked those sitting near him whether Associate Romick, who was not present, was "single," and appeared obsessed with whether she was "alone" or "with someone" as if it would be extremely sad if she was a single woman without a man. Plaintiff described this event to several colleagues, including Associate Romick herself, who became very uncomfortable, repeatedly saying "that's very

strange" and "that's so odd." Plaintiff also sent a text message to Paralegal Kornhaber describing this event. Upon information and belief, Defendant Managing Partner Yi's questions about Associate Romick were based on gender stereotypes about women in general, and single women, that they were somehow not "complete" without a man.

**Defendant Managing Partner Yi Forces Only Plaintiff to Come in to the Office
During the COVID-19 Pandemic**

138.    On or about March 7, 2020, Governor Andrew Cuomo ordered an emergency shutdown in response to the growth of the COVID-19 pandemic in New York. Governor Cuomo announced that all non-essential businesses would close, and only essential workers should travel. He partially lifted these restrictions on June 8, 2020 to allow non-essential businesses to open, but required employees to mask and socially distance six feet apart from one another.

139.    On or about June 21, 2020, Defendant Managing Partner Yi sent an email to employees, ordering them to return to work in the office.  But no preparations were made to ensure the safety of staff. Upon information and belief, staff members separately told Defendant Managing Partner Yi that they did not feel comfortable coming into the office at that time.

140.    Shortly thereafter, in or about late June or early July 2020, Defendant Managing Partner Yi called Plaintiff and screamed and yelled at her, asking why she was not coming in to the office to "help him." He swore at Plaintiff, "How the fuck will we survive" without an attorney in the office, and "I need you in here!"

141.    He ordered her to come into the office the next day. Plaintiff dutifully obeyed him, terrified of his fury, and was the only person in the office with Defendant Managing Partner Yi. Indeed, dutifully obeying Defendant Managing Partner Yi's needs was required of Plaintiff by Defendant Partner Kwun. In a group WhatsApp chat, Defendant Partner Kwun, on March 19, 2020, at 11:15am, wrote  that "[Defendant Managing Partner Yi is] big on face time and

spontaneous conferences, check-ins, etc., so this will be an adjustment for him . . . [Defendant Managing Partner Yi's] comfort level with it should be part of the process." Prioritizing her own safety and comfort, Defendant Partner Kwun made the maintenance of Defendant Managing Partner Yi's "comfort level" and need for in-person engagement entirely Plaintiff's responsibility.

142.    Upon information and belief, Defendant Managing Partner Yi did not ask anyone but Plaintiff – the only non-Korean or non-white attorney – to come into the office during that time period. When Plaintiff was working remotely, he had Paralegal Kuang do the same attorney-level work as Plaintiff. The remainder of Partner Yi's in-office attorney team, all Korean or white, were never requested or even suggested to come into the office, whereas Plaintiff was not given any choice.

143.    Similarly, a white paralegal, Jamie Kornhaber ("Paralegal Kornhaber"), decided, without asking permission, to not come into the office and to not work or respond to any communications, claiming she had to quarantine and not work for several weeks, and this was never questioned. However, the Chinese paralegal was threatened with termination, and the Hispanic paralegal was actually fired, after they claimed they needed to work remotely for a few days due to confirmed COVID-19 exposure. In fact, Defendant Partner Kwun subjected Plaintiff to sarcasm and verbal abuse after Plaintiff pointed out this disparate treatment to her.

144.    Defendant Managing Partner Yi did not wear a mask while in the office with Plaintiff, called COVID-19 "mass hysteria," and said he didn't know why "everyone was freaking out" about it.

145.    As was typical, he subjected Plaintiff to his abusive, discriminatory, and harassing behavior while she was in the office, and she continued to be the only attorney that he demanded must be in the office with him.

146.     Plaintiff reported to Defendant Partner Kwun the fact that she was the *only* person who was coming into the office during this time and that Defendant Managing Partner Yi continued to scream at her. She also told her she was anxious of contracting COVID-19. On March 18, 2020, at 7:35 p.m., after a stressful day in the office, Plaintiff sent a group text message to Defendant Partner Kwun and Associate Romick, in which she stated that "[Defendant Managing Partner Yi] is very upset" and wanted to create a "rotation," so that other attorneys could be responsible for being in the office with him on some days.

147.     Plaintiff asked Defendant Partner Kwun to require Associate Romick to come into the office part-time. Defendant Partner Kwun did not respond.

148.     Associate Romick sent Plaintiff a WhatsApp message stating that the firm's COVID-19 policy "just seems reckless," and insisted that she would not come in to the office under any circumstance.

149.     Defendant Partner Kwun responded by a half-hearted inquiry that she had "heard" of the attorneys possibly creating a  "rotation," but she did not press the issue, and Plaintiff continued to be the only attorney required to go into the office during the COVID-19 pandemic to suffer the fury of Defendant Managing Partner Yi.  Upon information and belief, Defendant Managing Partner Yi and Defendant Partner Kwun thought it was appropriate to subject Plaintiff to risk of COVID and the abuse of Defendant Managing Partner Yi because she was the only non-Korean and non-white attorney.

150.     Desperate for help, Plaintiff contacted Associate Romick, and asked that she trade off with her by coming in to the office at certain points. Associate Romick said she would not go into the office under any circumstances.

151.    Plaintiff asked Associate Romick whether she had heard of the Korean concept of Nunchi, and said that Defendant Managing Partner Yi used Korean culture to criticize her, because she was Chinese and not Korean. Associate Romick said that she had never heard anything about Korean culture or Nunchi from Defendant Managing Partner Yi.

152.    Meanwhile, on July 23, 2020, at 1:36am over WhatsApp messenger, when Plaintiff told Defendant Partner Kwun that she was disturbed by the racial disparities of the COVID-19 pandemic, and that she was mourning the death of her older "auntie"– who was Black and Chinese – who passed away from COVID-19, Defendant Partner Kwun responded immediately afterwards, at 1:39 a.m., informing her that "[a colleague's] dog also recently passed away" and followed this statement with a "smiley face."  Defendant Partner Kwun then turned the conversation back towards work. No mention or acknowledgment of Plaintiff's loss was ever made.

**Plaintiff Repeatedly and Consistently Reports to Defendants About Her Worsening Mental Health Disability, and They Ridicule Her, Scream at Her, and Fail to Respond**

153.    Plaintiff's workload and abuse by Defendant Managing Partner Yi continued to escalate throughout 2020.

154.    Plaintiff was working typically 100 hours per week. Defendant Partner Kwun demanded that Plaintiff stay awake with her until they finished work tasks, which was often until 2:00 or 4:00 a.m. Defendant Partner Kwun called, sent text messages, and sent "chat" messages to Plaintiff at all hours of the night and expected her, and nobody else on the attorney team, to respond, as she stated in group chat that she did not expect the team to work on the same hours as her – whereas in private conversation with Plaintiff, she engaged in opposite action, demanding she stay up late with her and have check ins late at night, demanding a daily detailed work summary email at 10:00 p.m.

155.    For example, on December 17, 2020, over email, knowing that Plaintiff was about to go to sleep, Defendant Partner Kwun wrote Plaintiff over email at 3:27am "Hi, before you turn in, can you do me a quick favor?" This quick favor was to review a series of emails Defendant Partner Kwun had sent out for attachment size and how to shrink attachment size, and took over 30 minutes to resolve. Such personal errands and unbillable tasks to assist Defendant Partner Kwun took up much of Plaintiff's time, blocking her ability to work billable hours, and taking up much of her time.

156.    Plaintiff repeatedly pulled "all-nighters" and did not sleep or have time to eat, and consistently informed Defendant Partner Kwun that she had not eaten for a day or slept at all that night, that she had been up all night. She told Defendant Partner Kwun repeatedly that she was "overwhelmed" and "upset." In this way, Plaintiff was repeatedly telling Defendant Partner Kwun that she was suffering from her mental health disability, which Defendant Partner Kwun already knew about because Plaintiff had previously disclosed this to her.

157.    Defendant Managing Partner Yi was even more demanding and abusive to Plaintiff when she was in the office with him. He threw paper at Plaintiff, ripped her work in front of her, and screamed at her.

158.    Plaintiff reported to Defendant Partner Kwun and Senior Associate Kim that she was receiving conflicting advice from the two of them and from Partner Wong, and she was upset and at a loss and did not know how to handle Defendant Managing Partner Yi's abusive behavior. Partner Wong told Plaintiff to "stand up for [her]self," and Defendant Partner Kwun and Senior Associate Kim told her to be deferential.

159.    Defendant Partner Kwun and Senior Associate Kim did not respond to this report, and they did nothing to assist Plaintiff.

160.    Plaintiff reported to Defendant Partner Kwun and to Defendant Managing Partner Yi regarding Paralegal Kornhaber's poor work and her absences. She stated to Defendant Partner Kwun that the two other paralegals reported that she was browsing the internet during work hours and not helping them at all.

161.    She asked Defendant Partner Kwun to either fire her and/or hire another paralegal to assist her in her work, because she could not do everything herself and this was causing exponentially more work for her. She said repeatedly that she was "overwhelmed" and "upset" and that she had "no support" because of this extra work due to the paralegal.

162.    Defendant Partner Kwun acknowledged Plaintiff's disability, but refused to accommodate her, and refused to get involved in correcting the hostile work environment.  She stated that she was "unfamiliar with HR protocols." This statement was untrue, as Plaintiff's first assignment under Defendant Partner Kwun was a client's HR manual.

163.    When Plaintiff tried to talk to Defendant Managing Partner Yi about Paralegal Kornhaber's extremely poor work product, he shouted at her: "If it's about [Paralegal Kornhaber], it's fine, no problem, no need to talk about it, JUST GET IT DONE!"

164.    Defendant Partner Kwun told Plaintiff that she must pull more "all-nighters" in order to finish the work.

165.    Upon information and belief, Defendant Partner Kwun was well aware that her responses to Plaintiff were exacerbating her mental health disability.

166.    Upon information and belief, Defendant Partner Kwun was well aware that her refusal to intervene and protect Plaintiff from the hostile work environment that Defendant Managing Partner Yi created was exacerbating Plaintiff's mental health disability.

167.    Upon information and belief, Defendant Partner Kwun had shared with Defendant Managing Partner Yi all of the information that Plaintiff had shared with her about her mental health disability, and Defendant Managing Partner Yi was well aware that his unreasonable demands and abusive treatment of Plaintiff were exacerbating her mental health disability.

168.    On August 25, 2020, at 8:50pm over WhatsApp messenger, Plaintiff told Senior Associate Kim that her mental health disability was failing because of Defendant Managing Partner Yi's abusive behavior. Senior Associate Kim became agitated, telling her to not complain and that she would only listen "just so we van [sic] laugh at" his behavior.  Senior Associate Kim sent Plaintiff an animated picture of a woman captioned: "YOU ARE SO DELUSIONAL."

169.    Plaintiff often told Defendant Partner Kwun that Paralegals Kuang and Carrasco had too much work on their plates to do Paralegal Kornhaber's work, and Defendant Partner Kwun did not listen, and so Plaintiff was forced to correct Paralegal Kornhaber's work herself. On July 28, 2020, over WhatsApp, Plaintiff informed Defendant Partner Kwun that she was at the office until late at night, and would work late into the night because she was correcting Paralegal Kornhaber's errors. Defendant Partner Kwun replied four minutes later, at 11:44 p.m., simply stating "omg … Sorry you have to spend time redoing her work!" and then piled more work onto Plaintiff, upon information and belief in the full knowledge that this would further exacerbate Plaintiff's mental health disability.

170.    Plaintiff made dozens of comments to Defendant Partner Kwun about her failing physical and mental health, and inability to eat or sleep due her workload, and Defendant Managing Partner Yi's abuse.

171.    Plaintiff said such things as "I've been working all night," "I haven't eaten today" "I didn't sleep last night because I was working," "I pulled an all-nighter," "I can't think straight

because I worked all night," "I'm upset and overwhelmed," "I need help," "I'm not feeling well." She also told her she had gone to the doctor several times because of her failing health, her vision had been suffering, and that she was working so much that she did not go outside.

172.    In response, Defendant Partner Kwun utterly ignored her, changed the subject, did not answer her, gave her more work, or said, falsely, that she was being "slow" and "unskilled." She would then bizarrely compliment Plaintiff on her work when she was not criticizing her. Defendant Partner Kwun also repeatedly and intentionally gave Plaintiff large volumes work that she could not bill for, such as doing all of Paralegal Kornhaber's work, and requiring her to do all training for unskilled Paralegal Gee. She refused to allow to Plaintiff to bill the actual amount of hours she worked on matters, because "Defendant Managing Partner Yi will ask why we are billing so much" and "we cannot ask for a budget increase."

173.    On another occasion, at about 4:00 a.m., Plaintiff and Defendant Partner Kwun were working together on a project and communicating by chat.  Plaintiff complained of her fatigue and stress, and Defendant Partner Kwun wrote back, "For your sanity, why don't you give more work to [Paralegal Kuang and Paralegal Carrasco]?"  Upon information and belief, Defendant Partner Kwun fully understood the nature of Plaintiff's mental health disability, the exacerbation of it that the law firm's demands on her were causing, Plaintiff's need for relief, Defendant Partner Kwun's ability to provide meaningful relief, and the pernicious effect on Plaintiff of Defendant Partner Kwun's refusal to provide meaningful relief.

174.    In addition, when Paralegal Kornhaber made an email joke to Defendant Partner Kwun and Plaintiff on August 3, 2020 at 10:12am that "[Defendant Managing Partner Yi] and [Partner White] are allowing me to use an office [] so my boyfriend and I don't kill each other in our tiny one bedroom apartment." Plaintiff reported over WhatsApp messenger on August 6, 2020

at 1:56am to Defendant Partner Kwun that the joke made her anxious and upset because of her past domestic abuse, stating "I found the 'so me and my boyfriend don't kill each other in our small apartment!' part to be rather unsettling."   Defendant Partner Kwun ignored this, and instead responded dismissively with a joke of her own: "Agree it was not a good joke. even if there is no DV concern, my thought was, try four people in a NYC 2-bed."

175.    On August 7, 2020, at 1:42pm,   Defendant Partner Kwun finally responded to Paralegal Kornhaber's email, reciting the same joke, with a winking face at the end of the email: "Ok, thanks! Try four bodies in a tiny NYC apartment."   Defendant Partner Kwun and Senior Associate Kim told Plaintiff repeatedly that the most important thing was to meet Defendant Managing Partner Yi's needs, not matter how outrageous.

176.    When Plaintiff asked her to consider her mental and physical health and hire another paralegal, Defendant Partner Kwun said that was entirely up to Defendant Managing Partner Yi.

177.    Defendant Partner Kwun also told Plaintiff that she was afraid Defendant Managing Partner Yi would "bitch-slap" her when she asked for a budget increase for one of their projects, but was very grateful that he had not become angry and agreed to the increase.

178.    Plaintiff also told Partner Wong that her physical and mental health was being affected by her work. Partner Wong dismissed and diminished Plaintiff's report of her serious mental health disability, and told her that she probably wasn't "sick," but just "stressed," and that he himself had been so stressed at work previously he had to "pretend" to call in sick just so he could get a "break."

179.    Partner Wong again refused to confront Defendant Managing Partner Yi about his abusive behavior, saying that Plaintiff must "learn to stand up for [herself]."

**Defendant Managing Partner Yi Fires Hispanic Paralegal for "Not Apologizing"**

180.    In or about November 2020, Paralegal Leivi Carrasco ("Paralegal Carrasco"), a Hispanic female paralegal, and Paralegal Kuang sent a joint email announcing that all staff should work from home, because they had been exposed to COVID-19 at the office.

181.    Defendant Managing Partner Yi yelled and screamed at them, furious that Paralegal Carrasco and Paralegal Kuang had not asked his permission to work from home, and demanded an apology.

182.    Paralegal Kuang apologized, but Paralegal Carrasco refused to do so.

183.    At a team meeting, Defendant Managing Partner Yi announced that Paralegal Carrasco was fired "for not apologizing for an act of insubordination."

184.    Plaintiff reported to Defendant Partner Kwun that the firing was unfair, and against New York State COVID-19 protocol regarding COVID-19 exposure in the workplace. She also said that this increased her own workload.

185.    Defendant Partner Kwun dismissed her by saying that they were all going to "just have to do more all-nighters." On January 19, 2021 at 11:48pm, via WhatsApp messenger, Plaintiff asked Defendant Partner Kwun for a pause as she had worked the entire day and into the night. Defendant Partner Kwun replied directly at 11:50pm, two minutes later, that Plaintiff should continue working on a spreadsheet. Defendant Partner Kwun did not allow Plaintiff to rest even after she directly asked.

186.    Plaintiff also complained to Partner Wong. Partner Wong seemed to consider that the firing violated New York State COVID-19 protocol, writing over WhatsApp on November 23, 2020 at 12:39pm "do you know if that's protocol, for [a COVID-positive employee] to be in the

office?" and asked "can you call my cell?" immediately after,  but then said during their phone call that there was "nothing [he] could do about that" and changed the subject.

187.    Partner Wong then said: "Let's talk about how you're doing, as I know you're not wanting to come into the office." Partner Wong suggested brainstorming ways that Plaintiff could "better perform [her] job," but said that it was her "decision on how to handle" Defendant Managing Partner Yi, and again told her to "stand up for" herself.

### Plaintiff Has a Mental Health/Suicidal Episode

188.    On or about January 21, 2021, Defendant Partner Kwun screamed at Plaintiff for mistakes that, upon information and belief, she knew Paralegal Gee, not Plaintiff, had made.

189.    Plaintiff left the room and began having a panic attack, in which she could not speak or think. She called a New York City suicide hotline for the first time in her life, and spoke for 45 minutes.

190.    Plaintiff told Paralegal Gee that she was suicidal due to Defendant Partner Kwun's verbal abuse and had called a suicide hotline, and told her she could not think or give her instructions to work because of this.

191.    Paralegal Gee saw that Plaintiff was having a panic attack, and said that she was afraid of what would happen to her if Plaintiff left the firm. She believed Defendant Partner Kwun would target her for abuse if Plaintiff left the firm.

### Defendant Partner Kwun Abusively Berates Plaintiff

192.    On or about January 25, 2021, Plaintiff attended a conference call during which Defendant Managing Partner Yi screamed at, berated, and belittled Defendant Partner Kwun in a ferocious verbal assault for mistakes that Defendant Partner Kwun had made when she reviewed work that Paralegal Gee had done.

193.   Immediately thereafter, Defendant Partner Kwun called Plaintiff and began screaming at her, saying that Defendant Managing Partner Yi's criticisms were really meant for Plaintiff, and that Defendant Managing Partner Yi "was right" and Plaintiff "deserved to be fired."

194.   She stated that Defendant Managing Partner Yi frequently discussed Plaintiff's "lack of judgment" and that this was Plaintiff's "problem"; Defendant Partner Kwun identified this alleged "problem" of Plaintiff's with a lack of judgment, and acknowledged that Defendant Managing Partner Yi concurred in that.

195.   Plaintiff told Defendant Partner Kwun that her workload was impossible, and that her mental health had suffered in order to meet her work product demands.

196.   Defendant Partner Kwun responded by screaming louder and with more intensity, "WHAT IS WRONG WITH YOU?" "WHAT HAS HAPPENED TO YOU?' "ARE YOU ON SOMETHING?" "WHAT HAS GOTTEN INTO YOU?" and "WHATS GOING ON?"

197.   Upon information and belief, Defendant Partner Kwun intended to exacerbate Plaintiff's  mental health disability and reinforce Defendant Managing Partner Yi's abuse of her.

198.   She told Plaintiff that all of the problems with the matter they were working on were exclusively Plaintiff's fault, which was entirely false because Plaintiff repeatedly caught mistakes by Defendant Partner Kwun and Paralegal Gee.

199.   When Plaintiff was finally able to get Defendant Partner Kwun to stop screaming, she explained that Defendant Managing Partner Yi had been angry about draft documents that Paralegal Gee had prepared, and not about Plaintiff's work.  Plaintiff told Defendant Partner Kwun that she had sent final drafts in a separate email to her and Defendant Managing Partner Yi.

200.    Defendant Partner Kwun screamed that she "never opened email attachments" and "You should know this by now!" (which was entirely false) and stated – "What is wrong with you?? Seriously, WHAT IS WRONG WITH YOU?"

201.    Driven to a point of exhaustion and beside herself, Plaintiff begged for forgiveness, and said that she was "not herself" because she had "not slept in three days." Defendant Partner Kwun laughed, mocked, and taunted Plaintiff.  Defendant Partner Kwun said she herself had "not slept in five years," and started screaming yet again that Plaintiff should "get over it" and "just stop complaining about [her] precious bedtime."

202.    On that same day, immediately after their phone call, Defendant Partner Kwun sent an email at 1:30pm to Plaintiff, in which she wrote "I am 100% in agreement with [Defendant Managing Partner Yi], as you know based on our calls in recent weeks. Please work on 20 packets each day until we are done . . . there should not be any other 'revisions' . . . Please send me check-in emails at [ ] 10pm." Defendant Partner Kwun continued to send angry messages to Plaintiff throughout the day and night. She never once suggested Plaintiff get any rest or stop working.

203.    Defendant Partner Kwun failed to recognize Plaintiff's report that the mistreatment of her by Defendant Partner Kwun and Defendant Managing Partner Yi was worsening her mental health disability.  Instead, Defendant Partner Kwun ridiculed her and screamed at her because of her mental health disability, and failed to do anything to accommodate or help her mental health disability.

204.    In fact, Defendant Partner Kwun's demand that Plaintiff complete "20 packets" of real estate documents per day was something that she herself could not do. Defendant Partner Kwun required Plaintiff to complete the real estate project within 5 days, based off the number of packets per day. As of this date, as evidenced in public land records, this same work that Defendant

Partner Kwun demanded Plaintiff complete within 5 days remains not even 60% complete, over one year later.

### Plaintiff Reports on Her Mental Health Issues Yet Again

205.    On or about January 27, 2021, at approximately 5:20 a.m., Plaintiff emailed Defendant Partner Kwun regarding the work tasks that she had completed, and she asked for "extra help" to finalize the project. She told her that for the "last few weeks" she had done "all-nighters" and had slept two hours a night, and it had "taken a considerable toll on [her] health," causing her to visit one doctor and attempt to visit a second doctor the day before.

206.    Defendant Partner Kwun did not respond to Plaintiff's report of the mental health issues she was suffering from, although she did respond twice to the email itself, simply writing a one sentence "Thanks!" and later replied again to Plaintiff's email with another extremely brief email asking to reschedule their daily phone call to accommodate Defendant Partner Kwun's schedule.

### Plaintiff is Constructively Terminated

207.    On or about January 28, 2021, Plaintiff was forced to resign due to suicidal thoughts and the mental health issues that she experienced as a result of the abuse that she experienced at the hands of Defendant Managing Partner Yi and Defendant Partner Kwun, as well as the gender, race, national origin, and disability discrimination and hostile work environment she experienced.

208.    Plaintiff sent a letter to Defendant Managing Partner Yi, Partner White, and Partner Richter, stating that she was resigning due to "an emergency medical issue" that she was "not comfortable discussing." She stated that "[b]ecause of the severity of this issue [she] was unable to provide advance notice."

209.    Plaintiff also sent a resignation letter to Defendant Partner Kwun, and a comprehensive "exit memo" with all of her assignments and work, including where to locate documents and other memorandum concerning her cases.  Plaintiff also explained to Defendant Partner Kwun that her health issue was a "life-or-death matter."

210.    Shortly after receiving Plaintiff's resignation letter, Defendant Partner Kwun suddenly changed course, begging Plaintiff to call her and writing in an email: "I'm shaken and so sad that you are resigning. I truly enjoyed working with you and have always regarded you as an intelligent, compassionate, and passionate member of the team. Our daily check-ins were a highlight of my day."

211.    Plaintiff was constructively terminated on account of her gender, race, national origin, and disability, and in retaliation for having complained of discrimination and a hostile work environment.

212.    Upon information and belief, Defendant Managing Partner Yi and Defendant Partner Kwun wanted Plaintiff to leave the law firm because she was unwilling to suffer discrimination and a hostile work environment in silence.

213.    Upon information and belief, Defendant Managing Partner Yi and Defendant Partner Kwun drove Plaintiff to this point with full knowledge that they were inflicting serious, lasting harm on Plaintiff's mental health.

## Post-Termination Retaliation and Harassment

214.    Following her resignation, Defendants' office manager Demi Mustafich repeatedly sent demanding messages and made repeated phone calls demanding that Plaintiff "help" Defendant Partner Kwun with free work.  She harassed Plaintiff to locate documents for her, even

though Plaintiff had stated in her exit memo that she had resigned due to a "life and death" situation.

215.    Upon information and belief, Defendant Partner Kwun and/or Defendant Managing Partner Yi asked Mustafich to harass Plaintiff in this way after Plaintiff's separation from the law firm.

216.    On February 26, 2021, Plaintiff's attorneys notified Defendants of Plaintiff's intention to pursue legal claims.

217.    Subsequently, with the help of an attorney, Plaintiff sought to obtain ERISA plan documents from Defendants' benefits plan pursuant to well established procedures and law. Defendant Managing Partner Yi, as the plan fiduciary, refused to cooperate and unnecessarily prolonged Plaintiff's efforts to obtain these documents for a period of many months. Defendant Managing Partner Yi refused to respond to repeated inquiries and correspondence from Plaintiff's attorney until he was contacted and required to do so by Emilio Pennes, of the U.S. Department of Labor.

218.    These actions by Mustafich, Defendant Partner Kwun, and Defendant Managing Partner Yi constituted post-termination harassment and retaliation against Plaintiff.

### AS AND FOR THE FIRST CAUSE OF ACTION
*Discrimination on the Basis of Race and Ethnicity in Violation of NYSHRL and NYCHRL*
Against All Defendants

219.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

220.    Defendants have discriminated against Plaintiff on the basis of her biracial Chinese-American and Caucasian race and ethnicity in violation of the New York State Human Rights Law, New York State Executive Law §§ 296 et seq., and the New York City Human Rights Law,

Administrative Code of the City of New York §§ 8-101 et seq.  Plaintiff has suffered both disparate

impact and disparate treatment as a result of Defendants' wrongful conduct.

221.    Defendants have discriminated against Plaintiff by treating her differently from and

less preferably than similarly situated Korean, Korean-American, and unambiguously "white"

employees and by subjecting her to harassment, a hostile work environment, discriminatory pay,

disparate terms and conditions of employment, constructive termination, and other forms of

discrimination on the basis of her race and ethnicity, by their own discriminatory acts, by aiding

and abetting discrimination, and by endorsing and condoning those acts.

222.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless,

and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

223.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies

available for violations of the New York City Human Rights Law and the New York State Human

Rights Law.

### AS AND FOR THE SECOND CAUSE OF ACTION
*Discrimination on the Basis of Gender in Violation of NYSHRL and NYCHRL*
Against All Defendants

224.    Plaintiff re-alleges and incorporates by reference each and every allegation in each

and every aforementioned paragraph as if fully set forth herein.gender in violation of the New

York State Human Rights Law, New York State Executive Law §§ 296 et seq., and the New York

City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq.  Plaintiff

has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful

conduct.

225.    Defendants have discriminated against Plaintiff by treating her differently from and

less preferably than male employees and by subjecting her to harassment, a hostile work

environment, discriminatory pay, disparate terms and conditions of employment, constructive termination, and other forms of discrimination on the basis of her gender, by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

226.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

227.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law.

### AS AND FOR THE THIRD CAUSE OF ACTION
*Discrimination on the Basis of Disability and Perceived Disability*
*in Violation of NYSHRL and NYCHRL*
Against All Defendants

228.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

229.    Defendants have discriminated against Plaintiff on the basis of her disability and/or perceived disability in violation of the New York State Human Rights Law, New York State Executive Law §§ 296 et seq., and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq.  Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

230.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly situated non-disabled employees and by subjecting her to harassment, a hostile work environment, discriminatory pay, disparate terms and conditions of employment, constructive termination, and other forms of discrimination on the basis of her

disability and/or perceived disability, by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

231.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

232.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
*Discrimination on the Basis of Status as Victim or Survivor of Domestic Violence*
*in Violation of NYSHRL and NYCHRL*
Against All Defendants

233.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

234.    Defendants have discriminated against Plaintiff on the basis of her status and/or perceived status as a victim or survivor of domestic violence in violation of the New York State Human Rights Law, New York State Executive Law §§ 296 et seq., and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 et seq.  Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

235.    Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly situated employees who were not and were not perceived to be victims or survivors of domestic violence, by subjecting her to harassment, a hostile work environment, discriminatory pay, disparate terms and conditions of employment, constructive termination, and other forms of discrimination on the basis of her disability and/or perceived disability, by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

236.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

237.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*Retaliation in Violation of the NYSHRL and NYCHRL*
Against All Defendants

238.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

239.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

240.    Further, after she was constructively terminated from her employment with Defendants, she notified Defendants that she intended to pursue legal claims against them for that discriminatory treatment.

241.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to harassment, a hostile work environment, constructive termination of her employment, and refusal to cooperate with her needs for post-employment documentation which Defendants were required to provide to her.

242.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

243.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

244.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York Human Rights Law.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Unequal Pay in Violation of the New York Equal Pay Act)*
Against All Defendants

245.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

246.    Defendants violated the right of Plaintiff to be paid the same as Korean, Korean-American, and white employees performing equal work in accordance with New York Labor Law § 194.

247.    Defendants were aware of complaints by Plaintiff concerning their unfair pay practices, but did not rectify or investigate those unlawful pay practices.

248.    Defendants' violations of the New York Equal Pay law were therefore willful, entitling Plaintiff to reimbursement of the wages she should have been paid, liquidated damages, and other damages provided by the statute.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress in Violation of New York Law*
Against Defendants Kwun and Yi

249.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

250.    Defendants knew that Plaintiff was vulnerable as a newly admitted attorney in her first job as a lawyer seeking to establish a career path, was vulnerable as a person suffering from

mental health issues that are frequently stigmatized in society in general and in the legal profession in particular, and was vulnerable as a person suffering from domestic violence.

251.   Defendants took advantage of Plaintiff's vulnerabilities when they gave her more work and more work hours than a reasonable newly admitted attorney could cope with, played upon and mocked her vulnerabilities, and denied her pleas for assistance and support.  These actions were extreme and outrageous.

252.   Defendants took these actions knowingly and with the intention to cause her severe emotional distress.

253.   The actions were tailored specifically to target each of her vulnerabilities in such a way that the result would be an exacerbation of each vulnerability beyond the bearable point.

254.   This brutal attack on Plaintiff's vulnerabilities produced the foreseeable and foreseen effect and caused Plaintiff to suffer aggravated, severe emotional distress.

255.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

256.   As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

257.   By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for their intentional infliction of emotional distress under New York law.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
*Fraudulent Inducement in Violation of New York Law*
Against Defendants Kwun and Yi

258.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

259.   Defendants induced Plaintiff to accept employment in the law firm by telling her she would do the work of an "entry-level associate" even though they later required her to do the work of a "de facto partner," as explicitly acknowledged by another one of the partners, Allen W. Wong, and, in addition, requiring her to do, re-do, or correct most of the work load ostensibly assigned to Paralegal Kornhaber, and, in addition, assigned her additional duties and responsibilities that had previously been handled by Senior Associate Kim and other duties and responsibilities that were supposed to be handled by Associate Romick.

260.   Defendants also induced Plaintiff to accept employment in the law firm by telling her she would be expected to work 10-hour workdays from 10:00 a.m. to 8:00 p.m., five days per week, even though they later required her to work from 16-hour workdays from 10:00 a.m. to 4:00 a.m., plus regular weekend work, without any extra compensation.

261.   Further, Defendants induced Plaintiff to remain in her position by promising her that they would address the work performance deficiencies of Paralegal Kornhaber, by promising her that they would arrange for relief to her in-office duties during the height of the Covid pandemic, and by promising her extra compensation, even though none of these promises came to fruition.

262.   Upon information and belief, Defendants knew when they made these promises that the promises were false and would not be kept; Defendants had no intention of making good on those promises; Defendants hoped and intended that the promises would satisfy Plaintiff and she would rely on the false promises to accept employment and continue in employment.

263.   Plaintiff did rely on those promises in accepting and continuing in employment.

264.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

265.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

266.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for their fraudulent inducement under New York law.

## JURY DEMAND

267.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, having set forth her Complaint, Plaintiff respectfully requests that she be awarded all available relief under the New York State Human Rights Law, the New York City Human Rights Law, the New York Labor Law, and New York common law, including, but not limited to, a declaratory judgment that the acts and practices of the Defendants complained of herein are in violation of law, injunctive relief, compensatory damages, statutory liquidated damages, punitive damages, prejudgment interest, attorney fees, expenses, and costs, and all other and further relief that the Court deems just and proper.


Dated: New York, New York
        February 25, 2022

                                        Respectfully submitted,

                                        GODDARD LAW PLLC
                                        *Attorneys for Plaintiff*


                                        By: _____/s/_____
                                        Megan S. Goddard
                                        Anthony P. Consiglio
                                        39 Broadway, Suite 1540
                                        New York, NY 10006
                                        Office: 646-504-8363

Fax: 212-473-8705
Megan@goddardlawnyc.com
anthony@goddardlawnyc.com